Nos. 19-30250

# UNITED STATES COURT OF APPEALS

# FOR THE

# NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,
v.

NATHAN WHEELER,

Defendant-Appellant.

Appeal from the United States District Court
for the District of Oregon
The Honorable Karin J. Immergut, United States District Judge
D.C. No. 3:18-CR-00161- IM

## BRIEF FOR DEFENDANT-APPELLANT

Terry Kolkey
Attorney at Law
2305-C Ashland St. 510
Ashland, OR 97520
(541) 512-1040
fax: (800) 637-7457
email: trkolkey@gmail.com
Attorney for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................... iii

Statement of Issues Presented ........................................... 1

Statement of the Case ...................................................... 1

Statement of Jurisdiction and Timeliness ......................... 2

Custody Status of Appellant ............................................. 2

Statement of Facts ........................................................... 2

Argument ...................................................................... 4

1. Introduction ............................................................... 4

II. Standards of Review and Proof ................................... 8

III. The Secured Notes Totaling $200,000 that
   Mr.Wheeler Purchased for Victims MM/SM
   and DK in 2011 and 2012 Should Have Been
   Deducted from the Total Guideline Losses ................... 9

    A. Calculation of Guideline Loss .................... 9

    B. Credits Against Losses ............................. 11

        1. General Principles ............................ 11

        2. Credits in the Present Case ................. 12

           a. Payments to MM/MS ......................... 13

           b. Payments to JB/JB ........................... 15

    c. Fair Market Value of 17 Real Estate Parcels .......  16

    d. SureSeal Investments ..........................................  17

  C. The SureSeal Investments Should Have Been
    Credited Against Losses ...........................................  20

IV. The Court Abused its Discretion in Accepting
  The Government's Evaluation of the Fair Market
  Value of 17 Real Estate Parcels ...........................................  25

Conclusion .....................................................................................  32

Statement of Related Cases ............................................................  34

Brief Format Certification ..............................................................  35

# TABLE OF AUTHORITIES

PAGE

## FEDERAL COURT CASES

*United States v. Austin,* 479 F.3d 363 (5th Cir. 2007) ................ 12

*United States v. Bright,* 353 F.3d 1114 (9th Cir. 2004) ................. 12, 15

*United States v. Deavours,* 219 F.3d 400 (5th Cir. 2000) ......... 8, 21, 25

*United States v. Hartstein,* 500 F.3d 790 (8th Cir. 2007) ............... 30

*United States v. Leonzo,* 50 F.3d 1086 (D.C. Cir. 1995) .............. 25

*United States v. McCormac,* 309 F.3d 623 (9th Cir. 2002*)* ....... 8, 21, 25

*United States v. Mount,* 966 F.2d 262 (7th Cir. 1992) ............. 8, 21, 31

*United States v. Phaneuf,* 91 F.3d 255 (1st Cir.1996) .............. 9, 25

*United States v. Staples,* 410 F. 3d 483 (8th Cir. 2005) ................ 12

*United States v. Rivers,* 917 F.2d 369 (8th Cir. 1990) .................... 30

*United States v. Rodriguez,* 765 F.2d 1546 (11th Cir. 1985) ........... 30

## STATUTES AND RULES

18 U.S.C. § 1343 ......................................................... 1

26 U.S.C.§7201 ......................................................... 1

28 US.C. §1291 ......................................................... 2

U.S.S.G §2B1.1 ..................... 4, 5, 9, 10, 11, 12, 15, 16, 20, 21, 22, 23

iii

Federal Rule of Appellate Procedure, Rule 32(a)(7)( C) .................. 34

Ninth Circuit Court of Appeals Rule 28-2.6 ................................... 33

Ninth Circuit Rule 32-1 .............................................................. 34

## STATEMENT OF ISSUES

1. Did the District Court misinterpret the Guidelines when it ruled that a secured investment obtained on behalf of victims did not count as a credit against the victims' losses under U.S.S.G. 2B1.1?

2. Did the District Court abuse its discretion when it used an appraisal of real property that was based upon triple hearsay and lacked any data or background supporting the appraisal and lacked any information about the experience or competence of the realtors who made the appraisal?

## STATEMENT OF THE CASE

### Nature of the Case and Course of Proceedings

On April 12, 2018, an information was filed in the district court charging Mr. Wheeler with one count of Wire Fraud in violation of 18 U.S.C. §1343, and one count of Attempt to Evade or Defeat Tax in violation of 26 U.S.C. §7201. On May 24, 2018, Mr. Wheeler pled guilty to both counts of the information.

On October 24, 2019, the court sentenced Mr. Wheeler to 51 months in prison on both counts to be served concurrently.

On November 5, 2019, Mr. Wheeler timely filed a notice of appeal.

### Statement of Jurisdiction and Timeliness

1

This court has jurisdiction under 28 U.S.C. section 1291. The district court's final judgment and commitment was entered on October 25, 2019. (CD 34; 2ER 162.)[1] Appellant timely filed a notice of appeal on November 5, 2019 (CD 37; 2ER 161.)

## Custody Status of Appellant

Mr. Wheeler is out of custody and scheduled to self-surrender to the Bureau of Prisons on September 25, 2020. (CD 48; 2ER 273.)

## STATEMENT OF FACTS

Mr. Wheeler was a Certified Public Account (CPA) in the State of Oregon. He and others operated Bridge City Advisors, LLC (Bridge City) in the District of Oregon. Bridge City offered accounting, investment and legal services to clients. (Presentence Investigative Report, (PSR), paragraphs 19-47.) Mr. Wheeler and others also held medical marijuana licenses issued by the State of Oregon to grow and distribute marijuana for a specific number of patients living in Oregon, as prescribed by a licensed physician or medical provider. (PSR 19-22.)

From 2011 to 2014, Mr. Wheeler used the funds of his Bridge City

---

1. The following abbreviations are used in this brief: CD refers to the Clerks Docket, followed by the docket entry number; ER refers to Excepts of Records in two volumes, 1ER, 2ER.

clients and investors, without their knowledge or consent to build and expand his medical marijuana operations, to pay other investors and clients, and for his own personal benefit. (PSR, 19-47.) Mr. Wheeler and partners solicited money for various investments from clients of Bridge City. (PSR 28, 41, 45.) He falsely promised investors that their money would be used for specific purposes, including the development of real estate projects. (PSR 28, 32.) As an inducement for the investments, Mr. Wheeler promised clients and investors a return of the investments plus a specific interest rate on the investments, and, in some instances, interest payments over the term of the investment. (PSR 31, 36.) He falsely informed some clients and investors that they would obtain a first priority security interest in real property to secure their money. (PSR 41.)

From 2011 to 2014, Mr. Wheeler did make numerous payments to clients' account and made secured investments in property for their benefits. The payments and investments substantially reduced the losses incurred by those clients.(CD 29; 2ER171.)

**ARGUMENT**

## I. Introduction

Mr. Wheeler made numerous payments and investments on behalf of several victims prior to the time that he became aware that his crimes had been detected. In his appeal, there are two issues: (1) which payments should be credited to reduce the victims' losses for guideline calculations, and, (2) what is the total value of those payments and investments.

Because Mr. Wheeler pled guilty to an economic crime, his guidelines are primarily based upon the total economic losses his clients suffered which were caused by his fraudulent activities. (U.S.S.G.§ 2B1.1.) According to U.S.S.G. §2B1.1, the base offense level is seven because the charges to which Mr. Wheeler pled guilty carry a maximum 20 year sentence. In addition, the Guidelines applicable to fraud cases provide for a graduated increase in the base offense level depending on the amount of loss resulting from conduct relevant to the counts of conviction. (U.S.S.G. § 2B1.1.) Under the Sentencing Guidelines, the base offense level for fraud is adjusted upward if the loss resulting from the fraud exceeded $6,500. (*See* U.S.S.G. § 2B1.1(b)(1).) Where the loss is greater than $1,500,000 but not more than $3,500,000, sixteen levels are added. (U.S.S.G. § 2B1.1(b)(1)(I).) When the

4

loss is greater than $3,500,000 but not more than $9,500,000, eighteen levels are added. (U.S.S.G. § 2B1.1(b)(1)(J).)

The amount of loss is calculated as the greater of the "actual loss," and the "intended loss." Actual loss means the reasonably foreseeable pecuniary harm that resulted from the offense. Intended loss means the pecuniary harm that the defendant purposely sought to inflict. (U.S.S.G. §2B1.1 application note 3(A).)

The Guidelines, however, provide that the total loss shall be reduced by the amount of money and the fair market value of property returned to the victims before the offense was detected. (U.S.S.G. 2B1.1, application note 3(E)(i).) If a defendant pledged or provided collateral to a victim, the total loss is reduced by the amount recovered from the collateral by the victims prior to sentencing or by the fair market value of the collateral at the time of sentencing. (U.S.S.G. 2B1.1, application note 3(E)(ii).)

During the sentencing hearing in this matter, the court ruled that February 5, 2014, was the date that Mr. Wheeler became aware that his fraudulent activities had been detected. As such, the court ruled that payments to victims made before that date would reduce the amount of the total loss, and payments to victims after that date would not.

At the sentencing hearing in this matter, the government presented evidence that the total actual loss to Mr. Wheeler's clients was $4,445,485.00. The amount of loss was not disputed. On the other hand, the parties presented conflicting evidence and arguments about whether the payments and assets that Mr. Wheeler provided his victims should be credited against guideline losses.

The government presented evidence that Mr. Wheeler provided the following payments and assets to the victims that should be deducted from the total losses:

 (1)   numerous cash payments to victims MM/SM over several months totaling $325,540;

(2)   cash payments to victims JB/JB totaling $14,310;

(3)   secured investments in a real estate development called Trotter Downs on behalf of two victims. According to the government, the property had a fair market value of $595,736.

After deducting these credits from the total losses, the government argued that the total guideline loss was $3,520,799. (This amount is $20,799.00 above the enhancement range of $1,500,000 and $3,500,000, which would be a 16 level increase instead of an 18 level increase.)

6

At the sentencing hearing, the defense presented evidence that the credits against losses should be the following:

(1)  Defense agreed that the qualifying payments to MM/SM were $325,540;

(2)  Defense agreed that the qualifying payments to JB/JB were $14,310.

(3)  Defense presented evidence that the fair market value of the investments in Trotter Downs was either $673,736.00, or $758,736.00, - as opposed to the government's figure of $595,736.00.

(4)  Investments in a company named SureSeal in the amount of $100,000.00, on behalf of victims MM/SM.

The investments were secured by the accounts receivable and the product inventory of SureSeal. The investments were made on behalf of the victims in October 2011, and November 2011, more than two years before defendant's crimes were detected.

(5)  Three investments in SureSeal totaling $100,000 on behalf of victim DK.

The three investments were all made in the year 2012, approximately two years before Mr. Wheeler's crimes were detected.

There were no factual disputes about the investments in SureSeal. The issue was whether those investments legally should be credited against the losses pursuant to the requirements of U.S.S.G 2B1.1 cmt. 3(E)(i) and (ii). The SureSeal investments on behalf of both clients totaled $200,000.

The parties did not dispute that the investments in the Trotter Downs property must be credited against the losses. The dispute concerned the fair market value of the property as mentioned above.

The government's calculation of the net loss amounted to $3,520,799, which was $20,799.00 above the cut-off for an 18 level enhancement. If the court had used the defense valuation of Trotter Downs or if the court had counted the SureSeal investments as credits, the enhancement would have been 16 levels.

## II. Standards of Review and Proof

Factual finding of the district court are reviewed for clear error. The application of the guidelines and the method of determining loss are reviewed de novo. (*United States vs. McCormac*, 309 F.3d 623, 627 (9th Cir. 2002); *United States vs. Deavours*, 219 F.3d 400, 402 (5th Cir. 2000).)

The meaning of the concept of loss under U.S.S.G. §2B1.1 is a legal determination and reviewed de novo. (*United States v. Mount*, 966 F.2d 262, 265 (7th Cir. 1992).)

When determining the amount of loss for sentencing purposes, the district court need only make a reasonable estimation of the loss given the available information. (*United States v. Phaneuf,* 91 F.3d 255, 261(1st Cir. 1996).)

The government has the burden of proving the amount of loss by a preponderance of the evidence. (*United States v. Leonzo*, 50 F.3d 1086, 1088, D.C. Cir. 1995).)

**III.    The Secured Notes Totaling \$200,000 that Mr. Wheeler Purchased for Victims MM/SM and DK in 2011 and 2012 Should Have Been Deducted from the Total Guideline Losses**.

**A.    Calculation of Guideline Loss**

The advisory guidelines provide that the guidelines for a defendant convicted of fraud should be increased according to the amount of economic loss that his victims suffered because of his fraudulent activities. (U.S.S.G.§2B1.1.) Section 2B1.1 includes a table that sets forth two-level incremental increases depending upon the total amount of loss. That table is partially reproduced below:

9

"If the loss exceeded $6,500, increase the offense level as follows:

LOSS (APPLY THE GREATEST) INCREASE IN LEVEL

(A) $6,500 or less no increase

(B) More than $6,500 add **2**

...............................................

(I) More than $1,500,000 add **16**

(J) More than $3,500,000 add **18**

(K) More than $9,500,000 add **20**

The guidelines establish a general rule that the amount of loss is to be calculated as the greater of the actual loss or the intended loss. (§2B1.1, application note 3.) Actual loss is defined as, "the reasonably foreseeable pecuniary harm that resulted from the offense." (§2B1.1, application note 3. (A)(i).) Intended loss is defined as "the pecuniary harm that the defendant purposely sought to inflict." (§2B1.1, application note 3, (A)(ii).) At the sentencing hearing in the present matter, both parties and the court dealt exclusively with actual losses. In its sentencing memorandum, the government stated that "because actual loss in this case is more than intended loss, actual loss is the measure," of guideline loss. (CD 26; 2ER 197.)

10

During the sentencing hearing, the government presented evidence that the actual loss was $4,455,385.16 (CD 26; 2ER 198.) The defense accepted this calculation, and the court used it in its rulings. (CD 41; 1ER 14, 110.)

## B. Credits Against the Loss

### 1. General Principles

The guidelines provide that "money returned and the fair market value of the property returned and the services rendered by the defendant or other persons acting jointly with the defendant to the victim before the offense was detected" shall be deducted from the total losses. (U.S.S.G.§ 2B1.1, cmt. n. 3(E)(i).) In cases involving "collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing," shall be deducted from the total losses. (U.S.S.G. 2B1.1, cmt. n. 3(E)(ii).)

Money, property, and services that were returned or provided to the victim after the defendant's crime was detected, however, are not credited against the victim's losses. The guidelines defines date of detection as the "earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the

offense was detected or about to be detected by a victim or government agency." (U.S.S.G.§2B1.1, cmt. n. 3(E)(i).) In the present matter, the court accepted the government's evidence and argument that the date of detection was February 4, 2014. (CD 41; 1ER 110.)

When money or property is transferred or paid to the victim before the defendant is aware that his crime has been detected or will be detected, courts have recognized that the act of making payments or giving assets to victims demonstrates that the defendant intended a smaller loss which also indicates that the offense is generally less serious  (See, *United States v. Austin*, 479 F.3d 363, 369, (5th Cir. 2007); *United States v. Staples*, 410 F.3d 484, 8th Cir. 2005);*United States v. Bright,* 353 F.3d 1114, 1118, (9th Cir. 2004).) Furthermore, when collateral is provided to victims, it is not reasonably foreseeable that the victims will suffer economic harm in the amount of the collateral. On the other hand, repayments made after detection may show no more than an effort to avoid accountability. (*Bright* at 1118.) Depending upon the type of collateral given by the defendant, the pledge of collateral may mean that the assets are always available to the victim; and therefore, the amount recovered at the time of sentencing or the fair market value of the collateral should be deducted from the total loss. (*Austin*, at 368.)

## 2.      Credits in the Present Case

At the sentencing hearing, the government presented evidence that Mr. Wheeler was entitled to the following credits (CD 29; 2ER 171.):

a.      Payments to victims MM/MS in the amount of $324,540.00 made prior to February 5, 2014. (Citing §2B1.1 cmt. n. 3(E)(I).) The payments made to MM/MS were the following (Defense Amended Sentencing Memorandum, Exh. 1, p.2.):

| Date of check | Amount of Check to MM/SM |
|---|---|
| 11/02/11 | $7,000 |
| 12/06/11 | $8,665 |
| 01/06/12 | $8,665 |
| 02/08/12 | $8,665 |
| 03/09/12 | $,8665 |
| 04/04/12 | $8,665 |
| 05/08/12 | $8,665 |
| 06/11/12 | $8,665 |
| 07/10/12 | $8,665 |
| 08/24/12 | $8,665 |
| 09/11/12 | $8,665 |

| | |
|---|---|
| 10/12/12 | $8665 |
| 11/14/12 | $8,665 |
| 12/04/12 | $8,665 |
| 01/03/13 | $8,665 |
| 02/15/13 | $8,665 |
| 03/15/13 | $8,665 |
| 04/12/13 | $8,665 |
| 05/16/13 | $8,665 |
| 07/02/13 | $8,665 |
| 07/15/13 | $8,665 |
| 08/16/13 | $8,665 |
| 09/10/13 | $8,665 |
| 10/03/13 | $100,000 |
| 10/24/13 | $3,915 |
| 11/05/13 | $7,665 |
| 12/02/13 | $7,665 |
| 01/15/14 | $7,665 |
| **TOTAL** | **$324,540.00** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

14

The above payments, totaling $324,540, were all made before February 5, 2014, which is the date the court ruled was the "date of detection" by Mr. Wheeler. (CR 41; ER 55.) As the above list illustrates, Mr. Wheeler made 27 payments on a regular monthly basis to victims MM/SM, and one additional payment of $100,000. As mentioned above, the reasoning behind commentary 3(E)(i), which requires that payments which are made before detection should be credited against losses, is that the act displays an intent to lessen the victim's harm and results in an actual reduction in loss. (See, *United States v. Bright,* 353 F.3d 1114, 1118, (9th Cir. 2004).)

After February 5, 2014, however, Mr. Wheeler continued the same pattern as the previous 26 months; that is, he made seven more monthly payments to the victims totaling $53,655. (Defense Amended Sentencing Memo, Exh. 1, p. 2.) By making these payments, the actual loss to the victims was reduced by $53,655. Circumstantially, Mr. Wheeler's intent in making the payments after February 5, 2014, was exactly the same as it had been during the previous 26 months - to reduce the loss to the victims and not to avoid culpability. This issue, however, was not discussed during the sentencing hearing.

15

b.      Payments to victims JB/JB totaling $14,310.00 made prior to February 5, 2014. (Citing §2B1.1 cmt. n. 3(E)(i).)

From November 5, 2013, until January 8, 2014, Mr. Wheeler made monthly payments to victims JB/JB in the amount of $4770, totaling $14,310.00. (Defense Amended Sentencing Memo, Exh. 1, p. 1.)[2] After February 4, 2014, Mr. Wheeler made another 15 payments over seven months totaling $43,924.00. (Defense Amended Sentencing Memo, Exh. 1, p.1.) These payments of $43,924.00 were not counted as reducing the total loss.

c.      **The fair market value of 17 parcels in a residential real estate development known as Trotter Downs**

The government presented evidence that the fair market value of 17 secured lots in the Trotter Downs development was $595,736.00. Sometime in late 2011, or in 2012, Mr. Wheeler used a client's money to buy an interest in a residential development project which was called Trotter Downs, and which consisted of 44 lots. (PSR 23.) Afterwards, Mr. Wheeler secured interests in 17 lots for two of his clients, JB/JB and CL.

---

2.    At the sentencing hearing, defense witness, Tiffany Couch, a forensic accountant, testified that one check for $4770 to victims JB/JB was cleared in their account on February 6, 2014. Based upon the date that the check cleared, she opined that the check was mailed to the bank before February 5, 2014.(1ER 80.)

16

(CR 26, 29, ER 175, 200.) At the time of the sentencing hearing, the 17 lots had not been sold and the victims had not yet received any payment for them. (CR 26, 29, ER 175.)

At the sentencing hearing, the government informed the court that both parties agree that the Guidelines provided for a credit against losses equal to the fair market value of the parcels in which Mr. Wheeler had obtained liens to secure the victims' interests. (CR 29; ER 174.) (citing U.S.S.G.§ 2B1.1, cmt. n.3(E)(ii).) The parties, however, presented different appraisals of the 17 lots. The court chose the government's appraisal and ruled that the fair market value of the 17 lots was $595,736.00. (CR 41; 1ER 109-110.)

**d.      SureSeal Investments totaling $200,000.00**

In 2011 and 2012, Mr. Wheeler made investments for victims MM/MS and KS in a company named SureSeal. The investments totaled $100,000 for each victim. They were secured by promissory notes and paid 12% interest. The defense argued that these investments should be credited against the total losses. The court ruled that the investments did not count. (CR 41;1ER 110.)

17

### i.   SureSeal Investments for Victims MM/MS

Mr. Wheeler worked as the CPA for victims MM/SM and persuaded them to invest money with him. (PSR. 44.) He created McDonald Holdings, Inc., a corporation for the McDonald investments.  (PSR 44.)  On September 13, 2011, the McDonalds transferred $670,000 into McDonald Holdings, LLC. (PSR 44, 45.)

On October 10, 2011, Mr. Wheeler invested $50,000 in SureSeal, LLC, on behalf of McDonald Holdings. The money, $50,000, was wired from the McDonald Holdings account to SureSeal, LLC. (PSR 47; 2ER 261; Govt. Exh. 8.) SureSeal executed a Promissory Note and Lending Agreement with McDonald Holdings as the beneficiary. (2ER 261-263; Govt. Exh. 8.) The Note executed by SureSeal paid 12% interest on the $50,000.00 loan, payable monthly. (2ER; 261; Govt. Exh. 8.)  The loan was also "secured by a prorated 1st lien and UCC filing against the Borrower's Account Receivables and Product Inventory. (2ER 263; Gov. Exh. 8, paragraph 9.) The note was payable on October 10, 2013. (1ER 46; 2ER 261; Govt. Exh. 8.) The cash from the loan, $50,000.00, however, was not paid to the victims until after February 5, 2014. (1ER 46.)

18

In November 2011, there was a second investment from McDonald Holdings to SureSeal, LLC in the amount of $50,000. (1ER 65, 79.) From 2011 until 2014, victims MM/SM were getting interest payments on the loans. (1ER 65, 79.) Agent Scott McGeachy, a special agent for the Internal Revenue Service, testified at the sentencing hearing that the investments in SureSeal on behalf of victims MM/SM were never lost, but in fact were performing as they were supposed to. (1ER 66.) In 2014, SureSeal began making payments to victim MM/SM at a rate which included principle and interest until the entire note was paid off. (1ER 66.) During an interview by Agent McGeachy, the owner of SureSeal indicated that the company was not having any financial problems. He indicated that the company needed the investments to continue operating. (1ER 72.)

## ii. SureSeal Investments on Behalf of Victim DK

In 2011, Mr. Wheeler starting working for victim DK as his certified public accountant. (PSR 29.) From 2011 to 2014, Mr. Wheeler embezzled $962,500 from DK's funds (PSR 31.) In 2012, Mr. Wheeler made three separate investments totaling $100,000.00 in SureSeal on behalf of victim DK. (1ER 40.) One investment was made on January 24, 2012, in the amount

19

of $50,000. (2ER 260; Gov. Exh. 7.) A second investment was made on June 7, 2012 for $30,000; and a third investment on December 28, 2012, for $20,000. (2ER 260; Gov. Exh. 6.) On June 1, 2014, SureSeal combined all three promissory notes into one note for $100,000, and extended the maturity date until June 1, 2017. (2ER 237-260; Govt. Exhs. 6, 7.)

All of the initial promissory notes as well as the consolidated promissory note executed by SureSeal paid 12% interest on the loans and were payable monthly. (2ER 237-259; Gov. Exh. 6.) The notes provided a mechanism for the lender to demand immediate payment of the entire note in the event of any default. (2ER 238, 243, 248; Gov. Exh. 6, paragraph 4.) Each loan also was "secured by a prorated 1st lien and UCC filing against the Borrower's Account Receivables and Product Inventory. (2ER 239, 244, 249; Govt. Exh. 6, paragraph 9.)

Agent McGeachy testified that SureSeal did make interest payments on the promissory notes prior to February 5, 2014, but some of the interest payments were diverted by Mr. Wheeler for his own purposes. (1ER 44, 63.) Agent McGeachy stated that the principle $100,000 investment in SureSeal was paid to DK sometime after February 5, 2014, but he did not know exactly when and how. (1ER 44, 64.) Government sentencing Exhibit 6,

page 23, however, shows that from July 10, 2014 until June 10, 2017, SureSeal made monthly payments of principle and interest to DK until the entire investment was repaid. (2ER 259; Govt. Exh. 6, p. 23.)

**C.    The SureSeal Investments Should Have Been Credited Against Losses**

The parties did not dispute any of the facts concerning the investments Mr. Wheeler made in SureSeal on behalf of his clients. The dispute involved the application of the Guidelines to those facts and the meaning of loss, payment, and credits. Specifically, the parties disagreed on whether the SureSeal investments should be considered payments to the victims based upon section 2B1.1, cmts. 3(E)(i) and (ii).

The application of the guidelines and the method of determining loss are reviewed de novo. (*United States vs. McCormac*, 309 F.3d 623, 627 (9th Cir. 2002); *United States vs. Deavours*, 219 F.3d 400, 402 (5th Cir. 2000).) The meaning of the concept of loss under U.S.S.G.§2B1.1 is a legal determination and reviewed de novo. (*United States v. Mount*, 966 F.2d 262, 265 (7th Cir. 1992).)

The court ruled that the SureSeal conveyances would not be counted as payments "because they were following the February 5, 2014, date, at which

the defendant knew or reasonably should have known that his illegal activities were being investigated." As such, the court did not consider the SureSeal payments to MM/MS and JB/JB in its loss calculations. (1ER 110.)

The investments in SureSeal, however, clearly match the definition of collateral found in section 2B1.1, cmt. 3(E)(ii). That commentary states that " in a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." shall be deducted from the total loss. (§2B1.1, cmt. 3(E)(ii).) As noted above, the SureSeal promissory notes promise to pay principle and interest to the investor until the full amount of the loan is paid. (2ER 237-259; Gov. Exh. 6.) In the event of a default in payment of any installment or principle or interest when due, the lender has the right to demand full payment immediately. (2ER 238, 243, 248; Govt. Exh. 6, paragraph 4.) The obligations of SureSeal were "secured by a prorated 1st lien and UCC filing against the Borrower's Accounts Receivable and Product Inventory." (2ER 239, 244, 249; Govt. Exh. 6. paragraph 9.) The dictionary definition of collateral is" security pledged for the payment of a loan."(Webster's New

22

Universal Unabridged Dictionary, Random House, 1996.) Furthermore, the SureSeal promissory notes, which include security agreements, meet the definition of "collateral" found in the Uniform Commercial Code section 9-102, entitled " Definitions,":

(12) "collateral" means the property subject to a security interest or agricultural lien. The term includes:

(A) proceeds to which a security interest attaches;

(B) accounts, chattel paper, payment intangibles, and promissory notes that have been sold;

(C) goods that are the subject of consignment.

The SureSeal promissory notes were all created approximately two years before the detection date, and they meet the description of collateral in section 2B1.1 commentary note 3(E)(ii).

Notably, commentary note 3(E)(ii) does not include reference to the cut-off of date of detection. Instead, it allows credit for the amount of payment at the time of sentencing or the fair market value at that time. Irrespective of this broader time frame, the SureSeal investments were created about two years before the court-determined detection date. Throughout that period of time and up until sentencing, the investments were

never lost; interest payments were made, and the full amount of the investments totaling $200,000 had been paid to the victims prior to sentencing.

The SureSeal investments were similar to the investments in Trotter Downs and should have been treated in the same manner. Both investments were secured by a piece of paper which gave the investors a security interest in property. In both instances, the investments happened years before the detection date and remained secure from the time of investment until either full payment was made to the SureSeal investors, which occurred before sentencing, or until the time of sentencing in the case of the Trotter Downs investments. Both the government, the defense, and the court agreed that the Trotter Downs properties, secured by paper documents, should be deducted from losses persuant to section 2B1.1 cmt. 3(E)(ii). There is no distinction between those investments and the SureSeal investments. The SureSeal investments were created at a time that clearly demonstrated Mr. Wheeler's intent to lessen the loss of the victims. In fact, the investments also provided some income. The actual loss to the victims was reduced by $200,000, which should be credited against the guideline losses.

24

### III.     The Court Abused its Discretion in Accepting the Government's Fair Market Value of the 17 Lots in Trotter Downs

Factual findings of the district court are reviewed for clear error. (*United States vs. McCormac*, 309 F.3d 623, 627 (9th Cir. 2002); *United States vs. Deavours*, 219 F.3d 400, 402 (5th Cir. 2000).) When determining the amount of loss for sentencing purposes, the district court need only make a reasonable estimation of the loss given the available information. (*United States v. Phaneuf*, 91 F.3d 255, 261(1st Cir. 1996).) The government has the burden of proving the amount of loss by a preponderance of the evidence. (*Unites States v. Leonzo*, 50 F.3d 1086, 1088, D.C. Cir. 1995).)

As noted above, the parties agreed that Mr. Wheeler was entitled to a credit against losses for the fair market value of 17 lots in the 'Trotter Downs' residential development. (CR 28;ER 174.) Two of his victims had first priority liens on those lots. The government and the defendant, however, presented different estimates of the fair market value of the property. At the sentencing hearing, the government presented evidence of the fair market value through the testimony of IRS agent Scott McGeachy, who has an accounting degree and a CPA license. (CD 41; 1ER 25-27.)

25

Agent McGeachy arranged to have all of the parcels appraised at two different times. (CD 41; 1ER 47.) He hired a contractor who then hired "three independent real estate brokers in the area of the parcels" to appraise the properties. (CD 41; 1ER 47.) Each broker made a separate appraisal for each of the 17 lots. (CD 41; 1ER 47.) Agent McGeachy testified that the "kind of value that they estimated for each piece of property" was set forth in Government Exhibit 1. (CD 41; 1ER 47.) According to the agent, the real estate brokers considered the size and placement of the lots within the development and the costs of bringing each parcel to a condition needed for a sale. (CD 41; 1ER 47-48.) Government sentencing exhibit 1, which Agent McGeachy mentioned, is a spreadsheet that lists all 17 parcels in the first column; the second column gives a single appraisal value for each parcel; the third column lists property taxes owed for each parcel; and the fourth column lists the victims who had liens on each corresponding parcel. (2ER 232; Govt. Exh. 1.)

Based upon information from the contractor and the three realtors, Agent McGeachy testified that the combined value of the 17 lots was $687,000. At the time of the property appraisals, $91,264.00 was owed in combined back property taxes for all 17 parcels. As such, the agent stated that

the net value of the 17 lots was $595,736.00. (CD 41; 2ER 232; Govt. Exh. 1.)

Agent McGeachy admitted that he did not personally talk to any of the real estate brokers who did the appraisals; he did not possess any knowledge of the availability of housing in the area of the undeveloped lots; he did not have reports of the underlying data used to create Government's exhibit 1; and, he did not have any information about the work history of the three real estate brokers. (CD 41; 1ER 56-60.) On the morning of the sentencing hearing, the government sent an email to defense counsel in which the names of the three real estate agents were provided. (CD 41; 1ER 104.)

In its Amended Sentencing Memorandum, the defense offered an appraisal of the Trotter Downs parcels that had been created by real estate broker Paul W. Valentine. (Defense Amended Sentencing Memo, Exh. 2, pp. 1-8.) In his letter of appraisal, Mr. Valentine states he had sold real estate for 27 years in the area of the Trotter Downs parcels and affirmed that he knew the area and market well. (Defense Amended Sentencing Memo, Exh. 15, p. 1.) Mr. Valentine's letter is dated October 8, 2019, sixteen days before the sentencing hearing. (Defense Amended Sentencing Memo, Exh. 2, p. 1.) He attached a page from his website which describes his many years of

27

experience in real estate sales. (Defense Amended Sentencing Memo, Exh. 2, pp. 2-3.) He also provided documents showing six comparable properties in the area which he used in making his appraisal of the Trotter Downs parcels. (Defense Amended Sentencing Memo, Exh. 2, pp. 4-8.) In his appraisal letter, Mr. Valentine stated that there were very few vacant-land sales in the area of Trotter Downs, and because of the demand for housing in the area of the Trotter Downs parcels, he was convinced the parcels would sell fairly easily. (Defense Amended Sentencing Memo, Exh. 2, p.1.) He estimated that the lots would sell for $45,000 each if sold as a package, and $50,000 if sold individually. (Defense Amended Sentencing Memo, Exh. 2, p.1.) In a follow-up email dated October 24, 2019, Mr. Valentine reiterated his belief that the lots would sell within a day for $45,000 if sold as a package. He also stated that it might take 30 days to sell them individually for the higher price of $50,000. (2ER 265; Defense Sentencing Hearing Exh. 101.) Using Mr. Valentine's appraisal, the victims' 17 lots have a combined value of $765,000.00, if sold in a package, and, $850,000.00, if sold separately. The net values, subtracting $91,264.00 in taxes owed, would be $673,736.00, and $758,736.00, respectively.

28

As noted above, the government's proof of the fair market value of the Trotter Downs parcels consisted of an exhibit with a list of values and the testimony of Agent McGeachy, who did not possess any first hand knowledge of the facts upon which the appraisals were based. The exhibit displays a single value for each of the 17 parcels even though three realtors were involved and made "independent" appraisals of each separate parcel. One doesn't know if the realtors provided three different values for each parcel, and the contractor used the average values when he or she created the spreadsheet in Exhibit 1; or if the contractor choose the values that he or she liked the most. Agent McGeachy never spoke to the realtors; he did not have the underlying data behind their appraisals; he did not possess information about the realtors' backgrounds, and he did not have any information about comparable sales in the area. Furthermore, the government did not provide any information about when the three appraisals were done. And, it was not until the morning of the sentencing hearing that the government sent an email to defense attorney with the names of the realtors. The court accepted the government's appraisal of the Trotter Downs parcels based upon the fact that there were three realtors from the area who agreed on the values, and the fact that appraisals were done for each individual parcel. (CD 41; 1ER 109.) The

29

court noted that it would have been better to have the realtors available in court, but their identities were provided to the defense earlier in the morning. (CD 41; 1ER 109.) [3]

An appraisal of real property that does not include a date when it was done, or include comparable sales in the area; which does not include any significant information about the backgrounds, experience and competence of the appraisers; which provides one figure to represent three appraisals - 17 times; and which does not provide any underlying data supporting the appraisals is an appraisal that would not be used by anyone for any purpose. It could not be relied upon for any transaction. The appraisal is based upon triple hearsay without any information to support its conclusions. The government and the court, however, used this information as a basis to increase the prison sentence of Mr. Wheeler.

Conclusions found in summary accounts, when challenged should *not* be considered as evidence but more like representations by the litigants. (See, *United States v. Hartstein*, 500 F.3d 790,795-96, (8th Cir. 2007).)

---

2.  The court also mentioned that "there was a tax agent who was looking at the taxable value of each of those." (CD 41; 1ER 109.) Actually, Agent McGeachy testified that the spreadsheet included the amount of back taxes owed on each parcel. He did not testify as a tax agent and did not testify about any taxable values. (CD 41; 1ER 49.)

30

Here, the defense presented contradictory evidence supporting a higher evaluation of the parcels. The defense evidence was supported by the type of detailed facts and background that indicates reliability and trustworthiness. On the other hand, the government's challenged figures were based upon hearsay that was unsupported by any evidence.

While hearsay evidence may be considered in sentencing hearings, due process requires that it bear a minimal indicia of reliability. (See, *United States v. Rodriguez,* 765 F.2d 1546, 1555, (11th Cir. 1985).) Generally, a sentencing court can consider all evidence and information in sentencing a defendant so long as it is reasonably reliable and trustworthy under the totality of circumstances. (See, *United States v. Rivers*, 917 F.2d 369, 371-72, (8th Cir. 1990).)  Mere conjecture based upon hearsay evidence coupled with a total lack of factual support does not meet the government's burden of proof. (*Id*., at 372-73.)

Because the government's evidence of the fair market value of Trotter Downs lacked any indicia of reliability and was totally lacking in factual support, it was an abuse of discretion for the court to use the government's appraisal. The court's use of the government appraisal directly affected the ultimate sentence. The court accepted the government's total loss figure of

$3,520,799.00, which included a $595,736 deduction for the value of the Trotter Downs parcels. (1ER 110; 2ER 235.) The advisory guidelines add 18 levels for a loss between $3,500,000 and $9,500,000. Thus, the government figures were $20,799 above a 16 level increase. The government's combined estimate of the 17 parcels, however, was $78,000 to $163,000 lower than the defense estimate. As such, the court's ruling on the fair market value of Trotter Downs directly affected the court's ultimate sentence. If a district court relies upon an invalid sentencing factor or misapplies the guidelines, the case should be remanded for resentencing unless the record as a whole shows the error was harmless and did not affect the court's selection of the sentence imposed. (See, *United States v. Mount*, 966, F.2d 262, 265, 7th Cir. 1992).) The court's reliance on the government's appraisal of Trotter Downs clearly affected the sentence and a remand is required.

## CONCLUSION

The secured investments totaling $200,000 that Mr. Wheeler made in SureSeal on behalf of some of his victims should have been credited against the losses of those victims. The court clearly misapplied and misinterpreted the guidelines by ruling that the SureSeal investments would not be counted

in the loss calculations.  Because the guidelines error directly affected Mr. Wheeler's sentence, the case should be remanded.

Because the government's evidence of the fair market value of Trotter Downs lacked any indicia of reliability and was totally lacking in factual support, it was an abuse of discretion for the court to use the government's appraisal.

Because the court's errors clearly affected Mr. Wheeler sentence, the case should be remanded for resentencing.

Date:    August 11, 2020

Respectfully submitted:

*S/s Terry Kolkey*

_____

Terry Kolkey
Attorney for Appellant

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,   )

        Plaintiff-Appellee,   )     CA No. 19-30250

                       )

    v.                  )

                       )

NATHAN WHEELER,         )

                       )

        Defendant-Appellant.   )

---

## STATEMENT OF RELATED CASES

---

I, Terry Kolkey, undersigned counsel of record for defendant-appellant, Nathan Wheeler, state pursuant to the Ninth Circuit Court of Appeals Rule 28-2.6 that I know of no other cases that should be deemed related.

DATED: August 11, 2020

                               *S/s Terry Kolkey*
                               Terry Kolkey
                               Attorney for Defendant-Appellant

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | CA No. 19-30250 |
| | ) | |
| v. | ) | |
| | ) | |
| NATHAN WHEELER, | ) | |
| | ) | |
| Defendant-Appellant. | | |

_____

BRIEF FORMAT CERTIFICATION
PURSUANT TO FRAP 32(a)(7)( C) AND
NINTH CIRCUIT RULE 32-1

_____

Pursuant to FRAP 32(a)(7)( c) and Ninth Circuit Rule 32-1, I certify that

Appellant's Opening Brief is proportionately spaced, has a typeface of 14 points

or more and contains 6,730 words.

DATED this August 11, 2020.

*S/s Terry Kolkey*
_____
Terry Kolkey
Attorney for Defendant-Appellant

35